# UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF NEW YORK

| | |
|---|---|
| SECURITIES AND EXCHANGE COMMISSION, | **FILED** IN CLERK'S OI U.S. DISTRICT COUI ★ APR 2 5 2i |
| Plaintiff, | Civil Action No. |
| vs. | BROOKLYN OI NO SUMMONS ISSUED |
| GARTH RONALD PETERSON CV 12-2033 | |
| Defendant. | WEINSTEIN, J. |

## COMPLAINT

Plaintiff Securities and Exchange Commission (the "Commission" or "SEC") alleges that:

## SUMMARY

1. From at least 2004 to 2007, Defendant Garth Peterson, while employed at Morgan Stanley & Co., Inc.'s ("Morgan Stanley") real estate investment and fund advisory business, secretly acquired millions of dollars worth of real estate investments from Morgan Stanley's funds for himself, the former Chairman of Yongye Enterprise (Group) Co. ("Yongye")—a Chinese state-owned entity with influence over the success of Morgan Stanley's real estate business in Shanghai—and others. Peterson also arranged to have paid to himself and the former Chairman of Yongye ("the Chinese Official") at least $1.8 million in what he misrepresented were finder's fees Morgan Stanley's funds owed to third parties. In exchange for offers and payments from Peterson, the Chinese Official helped Peterson and Morgan Stanley obtain business while personally benefitting from some of these same investments. This self-dealing and misappropriation by Peterson breached the fiduciary duties he and Morgan Stanley owed to their clients.

2.     By engaging in the conduct described in this Complaint, Peterson violated the anti-bribery and internal controls provisions of the Foreign Corrupt Practices Act of 1977 ("FCPA")—namely Sections 13(b)(5) and 30A of the Securities Exchange Act of 1934 ("Exchange Act") [15 U.S.C. §§ 78m(b)(5) and 78dd-1]—and aided and abetted violations of the anti-fraud provisions of the Investment Advisers Act of 1940 ("Advisers Act")—namely Sections 206(1) and 206(2) [15 U.S.C. §§ 80b-6(1) and 80b-6(2)].

3.     The Commission brings this action against Peterson seeking injunctive relief to prevent future violations of the federal securities laws, disgorgement, and a civil penalty.

**JURISDICTION**

4.     This Court has jurisdiction over this action under Sections 21(d), 21(e), and 27 of the Exchange Act [15 U.S.C. §§ 78u(d), 78u(e), and 78aa] and Section 209(d) of the Advisers Act [15 U.S.C. § 80b-9(d)].  The parties have consented to venue in the Eastern District of New York.

**DEFENDANT**

5.     Defendant Garth Peterson is a U.S. citizen and resident of Singapore who speaks Chinese fluently.  Peterson began working for Morgan Stanley in 2002 in Hong Kong.  He was made the head of the Shanghai office of Morgan Stanley's wholly-owned global real estate business when that office first opened in 2006 and became a Managing Director of Morgan Stanley in 2007.  Peterson's principal responsibility at Morgan Stanley was to evaluate, negotiate, acquire, manage and sell real estate investments on behalf of Morgan Stanley's advisers and funds.  As such, he owed a fiduciary duty to the fund clients.  By the time he was terminated in 2008 in connection with the conduct described in this Complaint, Peterson had been involved with at least twenty-eight Morgan Stanley transactions in China.

2

## OTHER PERSONS AND ENTITES

6.     Morgan Stanley & Co. Inc. is a Delaware corporation with its principal place of business in New York, New York. It owns global asset management, investment banking and securities businesses with more than 61,000 employees world-wide. At all pertinent times, Morgan Stanley had a class of securities registered pursuant to Section 12(b) of the Exchange Act [15 U.S.C. § 78l(b)], had securities listed on the New York Stock Exchange, and was subject to the reporting requirements of Sections 13 of the Exchange Act [15 U.S.C. §§ 78m].

7.     At all pertinent times, Morgan Stanley in part conducted its real estate investing business through wholly-owned SEC-registered investment advisers to, and minority investors in, approximately a half-dozen investment companies, a/k/a funds, organized as Delaware limited partnerships. As advisers and general partners to these funds, Morgan Stanley, though its employees, raised capital and made and managed real estate investments world-wide, and owed fiduciary duties to their clients. The funds most pertinent to the conduct described in this Complaint are MSREF IV International ("MSREF IV") and MSREF V International ("MSREF V"), which invested in securities of real estate companies, portfolios of real estate and real estate loans, and real estate directly. For each fund, Morgan Stanley formed a wholly-owned adviser that it registered with the SEC with its principal office and place of business at a Morgan Stanley address in New York, NY, and a website address of www.morganstanley.com/realestate. The adviser for MSREF IV, named MSREF IV, LLC, was registered November 2000; the adviser for MSREF V, named MSREF V, LLC, was registered January 3, 2005. Many of the investors in Morgan Stanley's funds, including Morgan Stanley employees, were U.S. persons and many sales of limited partnership interests in the funds occurred in the U.S.

8.     At all pertinent times, Yongye Enterprise (Group) Co. Ltd. was a large real estate

3

development arm of the Luwan District Government in Shanghai, China. Since its inception in 1994, Yongye held leases for many prime areas in the Luwan District. Yongye's business was to keep or take a small share in real estate joint ventures, including with Morgan Stanley and its funds, in exchange for helping its joint venture partner obtain the proper licensing from the local government. Yongye owned and developed residential and commercial real property, sold and brokered real estate to Morgan Stanley and its funds, and partnered with Morgan Stanley and its funds in various real estate investments.

9. The Chinese Official was the Chairman of Yongye at all pertinent times until his retirement in September 2006. As Chairman, he exercised control over Yongye and had the authority to make investment decisions for it. Before Yongye, the Chinese Official worked for the Luwan District government. After his retirement in September 2006, the Chinese Official continued to work with Morgan Stanley as a private real estate developer and broker until approximately the time Peterson was terminated in 2008.

10. The Canadian Attorney at all times pertinent to the conduct described in this Complaint worked in Hong Kong for law firms and for an insurance company as its chief legal officer.

## FACTUAL BACKGROUND

11. Peterson began at Morgan Stanley in 2002 with a pre-existing business and personal relationship with the Chinese Official, an experienced Shanghai real estate investor and Chairman of the Luwan government-owned entity Yongye. Peterson led Morgan Stanley's effort to build a Chinese real estate investment portfolio for its real estate funds by cultivating a relationship with the Chinese Official to take advantage of his ability to steer opportunities to Morgan Stanley, his familiarity with and influence in helping with needed governmental

4

approvals, and his real estate investment and management experience generally. During the pertinent period, Morgan Stanley partnered with Yongye in a number of significant Chinese real estate investments and recognized Yongye, led by the Chinese Official, as one of Morgan Stanley's most significant partners in China. At the same time, Peterson and the Chinese Official expanded their personal business dealings, both in a real estate interest secretly acquired from Morgan Stanley, as well as by investing together in Chinese franchises of well-known U.S. fast food restaurants. Peterson failed to disclose all these investments in annual disclosures of personal business interests Morgan Stanley required him to make as part of his employment.

### Project Cavity
### [Shanghai Jin Lin Tiandi Serviced Apartments]

12.    In 2002, in a project named "Project Wally," MSREF IV co-invested as a minority partner with Yongye and other investors in a dual-use, two-tower building in the Luwan District of Shanghai. In late 2004, in a transaction called "Project Cavity," MSREF IV, along with others, purchased one of these two towers, known as the Shanghai Jin Lin Tiandi Serviced Apartments. As one of the sellers in Project Cavity, Yongye's approval was required before the sale could take place. In addition, because Yongye was the project manager for the selling consortium, it managed the sale process. As Morgan Stanley and Peterson were negotiating the purchase of Project Cavity in October 2004, Peterson, the Chairman of Yongye (the Chinese Official) and the Canadian Attorney secretly were planning to purchase an interest from MSREF IV after MSREF IV purchased the tower from the selling consortium. As the vehicle for purchasing and holding their interest, Peterson, the Chinese Official and the Canadian Attorney used a British Virgin Islands entity called Asiasphere Holdings Ltd. ("Asiasphere"). As described below in paragraph 16, they misrepresented to officers and employees of Morgan Stanley that Asiasphere was a subsidiary of Yongye. Accordingly, officers and employees of

Morgan Stanley who had decision making authority over whether MSREF IV would sell an interest in Project Cavity believed that they were selling that interest to Yongye, when, in fact, they were unknowingly selling the interest to Peterson, the Chinese Official and the Canadian Attorney.

13.     In his effort to convince Morgan Stanley and its fund to sell an interest in Project Cavity to Asiasphere—an entity officers and employees of Morgan Stanley believed to be Yongye—Peterson told others at Morgan Stanley that the Chinese Official, in his capacity as Chairman of Yongye, caused the selling consortium to sell Project Cavity to Morgan Stanley at a price that was lower than a competing offer. According to emails Peterson wrote to his Morgan Stanley colleagues at the time MSREF IV bought Project Cavity, the Chinese Official showed Peterson the written offer of one competing bidder in confidence "to make clear the competition we're facing" and had "really gone out of his way to help [Morgan Stanley] on this deal." In November 2005 as the time neared for Asiasphere's purchase from MSREF IV, Peterson told his colleagues, "WE OWE [YONGYE] A FAVOR . . . [Yongye] gave us this deal." (Emphasis in original.) Peterson also credited the Chinese Official with helping obtain approvals required from other Chinese government entities for the deal to close.

14.     Peterson, the Chinese Official and the Canadian Attorney funded their nearly $3 million Cavity investment in March 2006 and, through Asiasphere, purchased approximately 12% of MSREF IV's interest. Asiasphere paid its purchase price in U.S. Dollars to a Morgan Stanley bank account in New York City. The Chinese Official owned 47% of Asiasphere, and Peterson and the Canadian Attorney shared the remaining 53%—through their ownership, 81% and 19% respectively, of a British Virgin Islands company called Strong Man Ltd. Peterson controlled this 81% interest in Strong Man directly and/or through a British Virgin Islands

6

company called Paraplay. Altogether, Peterson had a 43% interest in Asiasphere. Asiasphere

bought 12% of Jin Lin Tiandi Holding Company, a Caymans Island Company, which owned the

Shanghai Jin Lin Tiandi Serviced Apartments as follows: Jin Lin Tiandi Holding Company

owned 100% of and controlled Sky Luck Property Corp., a British Virgin Islands Company;

which owned 100% of and controlled King Project Limited, a Hong Kong Company; which

owned 100% of and controlled Shanghai Jin Lin Tiandi Serviced Apartment Management Co.

Ltd., a People's Republic of China Company; which owned 100% of and controlled the Shanghai

Jin Lin Tiandi Serviced Apartments in Shanghai, China.

15. In negotiating both sides of the transaction, Peterson also arranged for Asiasphere

to buy its interest in Project Cavity at MSREF IV's October 2004 basis. Accordingly,

Asiasphere's near-$3 million investment was already in-the-money by as much as $6 million at

the time of the investment in 2006 because the property had risen in value since Morgan

Stanley's fund bought it in late 2004. This secret self-dealing breached the fiduciary duties

Peterson and Morgan Stanley owed to their fund client.

16. As enumerated below, Peterson, the Chinese Official and the Canadian

Attorney—who acted as Asiasphere's attorney for the deal—lied to others at Morgan Stanley

that Yongye was the purchaser. To make Morgan Stanley believe it was selling the Cavity

interest to Yongye, Peterson, the Canadian Attorney and the Chinese Official misrepresented that

Asiasphere was an offshore subsidiary of Yongye. During the years preceding the Cavity

transaction, Morgan Stanley engaged in a number of real estate transactions involving Yongye

and had learned that Yongye conducted its business through a Hong Kong holding company and

a BVI holding company all of which Morgan Stanley employees referred to interchangeably as

Yongye, "YY" or "YYI". During these years, Morgan Stanley had conducted due diligence into

7

Yongye, its Chairman (the Chinese Official) and its two offshore entities.  As Peterson knew,

Morgan Stanley's due diligence included interviews with the Chinese Official and the Canadian

Attorney (who represented a Yongye entity), record reviews, and background and reference

checks.  Examples of Peterson, the Chinese Official and the Canadian Attorney's

misrepresentations that Yongye owned Asiasphere include the following:

      a.     On or about October 28, 2004, Peterson sent an email to several Morgan

Stanley employees in which he explained that Yongye, and not the Chinese Official, would be

acquiring a 12-percent stake in Project Cavity, falsely writing "[j]ust to be clear, [the Chinese

Official] will not 'acquire another 4.5% of shares' from [Morgan Stanley].  It's Yong Ye . . ."

      b.     On or about November 16, 2005, Peterson emailed several Morgan

Stanley employees in response to an email discussing the terms of Yongye's purported

investment in Project Cavity, "Everyone pls [sic] keep in mind the big picture here.  YY gave us

this deal. . . . So we owe them a favor relating to this deal. . . . This should be very easy and

friendly."

      c.     On or about November 23, 2005, Peterson sent an email to several Morgan

Stanley employees in which he described "YYI" as "our friends who are coming in because WE

OWE THEM A FAVOR."  (Emphasis in original.)

      d.     At Peterson, the Chinese Official and the Canadian Attorney's doing, the

2006 shareholder agreement for Project Cavity used the abbreviation "YY" to refer to

Asiasphere.

      e.     After the March 2006 sale, Peterson and the Canadian Attorney made

additional misrepresentations about Asiasphere's ownership.  For instance, on or about August 4,

2006, the Canadian Attorney falsely represented to a Morgan Stanley employee that Asiasphere was owned by Yongye, writing "I confirm, as Asiasphere's counsel in their acquisition of 12% equity interests in [Project Cavity], that Asiasphere Holdings Limited is 100% beneficially owned by Shanghai Yongye Enterprise (Group) Co., Ltd., a PRC company whose legal address is 32nd floor, 138 Huai Hai Zong Lu, Shanghai, China." This misrepresentation was made in response to an inquiry from a Morgan Stanley employee pursuant to a third party's know-your-customer requirements in connection with a refinancing being sought for Project Cavity.

17.    Peterson never disclosed his own stake, in annual disclosures of personal business interests Morgan Stanley required him to make as part of his employment or otherwise, until around the time of his termination in late 2008. Morgan Stanley paid Asiasphere approximately $2 million in at least five separate Cavity shareholder distributions from 2006 to 2008. Peterson was entitled to approximately $860,000 of these distributions based on his ownership of Asiasphere.

### Project 138
### [Shanghai Square Infiniti Mall]

18.    In 2005, and without Morgan Stanley's knowledge, Peterson and the Canadian Attorney secretly acquired from Morgan Stanley and its MSREF V Fund an interest in another Luwan District real estate deal called Project 138. MSREF V acquired the retail property earlier in 2005 and in October, at Peterson's doing, sold 10% of it to a group of buyers led by a Shanghai real estate designer and investor who had a prior business relationship with Morgan Stanley ("the Shanghai Investor"). Without disclosure to Morgan Stanley or its fund, and without mention in the transactional documents they prepared, Peterson and the Canadian Attorney—who acted as the Shanghai Investor's lawyer—bought approximately 1% of the Project as part of the Shanghai Investor's group. In fact, when others at Morgan Stanley asked

9

who the Shanghai Investor's co-investors were, the Canadian Attorney and Peterson directed the

Shanghai Investor not to reveal their identities. Peterson also failed to disclose his stake in

Project 138 in annual disclosures of personal business interests Morgan Stanley required him to

make as part of his employment. As in Project Cavity, Peterson negotiated both sides of this

Project 138 sale to himself. While managing the Morgan Stanley staff responsible for

negotiating the sale and protecting MSREF V's interests, Peterson secretly helped the Shanghai

Investor and the Canadian Attorney negotiate the terms of the written purchase and sale

agreements. This secret self-dealing breached the fiduciary duties Peterson and Morgan Stanley

owed to their fund client.

### The 3-2-1 Deal and Project Beatles

19.     As Peterson and Asiasphere funded their investment in Project Cavity in early

2006, Morgan Stanley was negotiating at least five separate Chinese real estate investments

involving Yongye and its Chairman—the Chinese Official. To incentivize the Chinese Official

to help Morgan Stanley win this business and to reward the Chinese Official for all he had done

for Morgan Stanley and Peterson personally—and despite his recognition that the Chinese

Official's "position as head of [Yongye didn't] allow him to make such investments"—Peterson,

on behalf of Morgan Stanley, invited the Chinese Official personally to invest with Morgan

Stanley and its funds in these five pending investments at a discount. Accordingly, Peterson

offered an arrangement referred to here as the 3-2-1 deal. Under the terms of the deal, Morgan

Stanley would sell the Chinese Official a 3% interest in each deal he brought to Morgan Stanley

for the cost of 2%, providing the Chinese Official a 1% discount Peterson called a "finder's fee."

Peterson also promised to pay the Chinese Official an added return on any completed purchase

he called a "promote," to incentivize the Chinese Official to help make any acquired investments

10

profitable.

20.     Project Beatles was one of the investments covered by the 3-2-1 arrangement with the Chinese Official. It was a large-scale mixed-use development project Morgan Stanley and its MSREF V fund negotiated and bought from the Luwan government, with Yongye as a minority investor. In early 2006, Morgan Stanley began negotiating the purchase, which closed in October. While Yongye was not the seller, the Luwan government asked the Chinese Official to find potential buyers and Morgan Stanley credited him as a finder. Morgan Stanley also credited the Chinese Official with other help on the deal, including obtaining a favorable price. Morgan Stanley also credited the Shanghai Investor as a finder, who Morgan Stanley hired as one of the project's designers and developers and who was the same person through whom Peterson bought his secret interest in Project 138.

21.     In the context of recommending to supervisors in Morgan Stanley's real estate business that Morgan Stanley funds make at least four of these real estate acquisitions, Peterson disclosed to these supervisors the proposed 3-2-1 arrangement with the Chinese Official in April 2006. Less than a month later, however—before the official had been paid anything—a Morgan Stanley employee in the controller function of Morgan Stanley's real estate business warned of the bribery implications of paying the Chinese Official personally for help obtaining business. One of Peterson's Morgan Stanley supervisors then instructed Peterson to abandon the 3-2-1 deal with the Chinese Official.

22.     Peterson still secretly shared with the Chinese Official part of a finder's fee Peterson caused Morgan Stanley and its funds to pay the Shanghai Investor for Project Beatles. Specifically, in March 2007, six months or so after the Chinese Official retired from Yongye, Peterson caused Morgan Stanley and MSREF V to pay the Shanghai Investor a $2.2 million

11

finder's fee. The Shanghai Investor transferred $1.6 million of this fee to Peterson, who gave nearly $700,000 to the Chinese Official and kept the rest for himself. The Shanghai Investor agreed to help Peterson steal these funds in exchange for his promise to help the Shanghai Investor get future business from Morgan Stanley. Peterson kept his payment to the Chinese Official and his own kickback a secret from his Morgan Stanley supervisors and the MSREF V Fund. This misappropriation of funds breached the fiduciary duties Peterson and Morgan Stanley owed to their fund client.

**Morgan Stanley's FCPA Compliance Program and Internal Controls**

23.     Morgan Stanley trained Peterson on the FCPA numerous times during his employment, as follows:

(1)     Morgan Stanley trained Peterson on anti-corruption policies and the FCPA at least seven times between 2002 and 2008. In addition to other live and web-based training, Peterson participated in a teleconference training conducted by Morgan Stanley's Global Head of Litigation and Global Head of Morgan Stanley's Anti-Corruption Group in June 2006.

(2)     Morgan Stanley distributed to Peterson written training materials specifically addressing the FCPA, which Peterson maintained in his office.

(3)     A Morgan Stanley compliance officer specifically informed Peterson in 2004 that employees of Yongye, a Chinese state-owned entity, were government officials for purposes of the FCPA.

(4)     Peterson received from Morgan Stanley at least thirty five FCPA-compliance reminders. These reminders included FCPA-specific distributions;

12

circulations and reminders of Morgan Stanley's Code of Conduct, which included

policies that directly addressed the FCPA; various reminders concerning Morgan

Stanley's policies on gift-giving and entertainment; the circulation of Morgan

Stanley's Global Anti-Bribery Policy; guidance on the engagement of consultants;

and policies addressing specific high-risk events, including the Beijing Olympics.

(5)     Morgan Stanley required Peterson on multiple occasions to certify his

compliance with the FCPA.  These written certifications were maintained in

Peterson's permanent employment record.

24.     Morgan Stanley required each of its employees, including Peterson, annually to

certify adherence to Morgan Stanley's Code of Conduct, which included a portion specifically

addressing corruption risks and activities that would violate the FCPA.

25.     Morgan Stanley required its employees, including Peterson, annually to disclose

their outside business interests.

26.     Morgan Stanley had policies to conduct due diligence on its foreign business

partners, conducted due diligence on the Chinese Official and Yongye before initially conducting

business with them, and generally imposed an approval process for payments made in the course

of its real estate investments.  Both were meant to ensure, among other things, that transactions

were conducted in accordance with management's authorization and to prevent improper

payments, including the transfer of things of value to officials of foreign governments.

**FIRST CLAIM**
**Violations of Section 30A of the Exchange Act**
**(Bribery)**

27.     Paragraphs 1 through 26 are realleged and incorporated by reference herein.

28.     Section 30A(g) of the Exchange Act [15 U.S.C. § 78dd-1(g)] prohibits any issuer,

or any United States person that is an officer, director, employee, or agent of such issuer or a stockholder thereof acting on behalf of such issuer, to corruptly do any act outside the United States, irrespective of whether the mails or any means or instrumentality of interstate commerce are used, in furtherance of an offer, payment, promise to pay, or authorization of the payment of any money, or offer, gift, promise to give, or authorization of the giving of anything of value to any foreign official for the purpose of (i) influencing their acts or decisions, inducing them to do or omit to do any act in violation of their lawful duty, or securing an improper advantage, or (ii) inducing them to use their influence with a foreign government or instrumentality thereof to affect or influence any act or decision of such government or instrumentality, in order to assist such issuer in obtaining or retaining business.

29.     By reason of the foregoing offers and payments to the Chinese Official, Peterson violated, and unless restrained and enjoined is reasonably likely again to violate, Section 30A(g) of the Exchange Act [15 U.S.C. § 78dd-1(g)].

**SECOND CLAIM**
**Violations of Section 13(b)(5) of the Exchange Act**
**(Circumvention of Internal Controls)**

30.     Paragraphs 1 through 26 above are realleged and incorporated by reference herein.

31.     Section 13(b)(5) of the Exchange Act [15 U.S.C. § 78m(b)(5)] prohibits any person from knowingly circumventing or knowingly failing to implement a system of internal accounting controls or knowingly falsifying any book, record, or account described in Section 13(b)(2) of the Exchange Act [15 U.S.C. § 78m(b)(2)].

32.     By reason of the foregoing, Peterson violated, and unless restrained and enjoined is reasonably likely again to violate, Section 13(b)(5) of the Exchange Act [15 U.S.C. §

14

78m(b)(5)].

## THIRD CLAIM
### Aiding and Abetting Violations of Sections 206(1) and 206(2) of the Advisers Act
### (Fraud)

33.     Paragraphs 1 through 26 above are realleged and incorporated by reference

herein.

34.     Section 206 of the Advisers Act [15 U.S.C. §§ 80b-6(1) and 80b-6(2)] makes it

unlawful for any investment adviser, by use of the mails or any means or instrumentalities of

interstate commerce, directly or indirectly, knowingly, willfully, or recklessly:

> (1)     to employ any device, scheme, or artifice to defraud any client or
>
> prospective client; or

> (2)     to engage in any transaction, practice, or course of business that operates
>
> as a fraud or deceit upon any client or prospective client.

35.     Section 203(d) of the Advisers Act [15 U.S.C. § 80b-3] provides that Section 206

[15 U.S.C. §§ 80b-6] and other provisions of the Advisers Act apply to investment advisers

registered with the Commission pursuant to Section 203, or any person acting on behalf of such

an investment adviser, irrespective of any use of the mails or any means or instrumentality of

interstate commerce.

36.     During the relevant period, MSREF IV, LLC, and MSREF V, LLC, were

investment advisers within the meaning of Section 202(a)(11) of the Advisers Act [15 U.S.C. §

80b-2(a)(11)] registered with the Commission pursuant to Section 203 of the Advisers Act [15

U.S.C. § 80b-3].

37.     During the relevant period, Peterson was a person associated with an investment

15

adviser within the meaning of Section 202(a)(17) of the Advisers Act [15 U.S.C. § 80b-2(a)(17)] and a person acting on behalf of an investment adviser within the meaning of Section 203(d) of the Advisers Act [15 U.S.C. § 80b-3].

38.    Peterson, by engaging in the conduct described above, knowingly or recklessly substantially assisted violations of Sections 206(1) and 206(2) of the Advisers Act [15 U.S.C. §§ 80b-6(1) and 80b-6(2)] by MSREF IV and MSREF V.

39.    By reason of the foregoing, Peterson aided and abetted, and unless restrained and enjoined is reasonably likely again to aid and abet, violations of Sections 206(1) and 206(2) of the Advisers Act [15 U.S.C. §§ 80b-6(1) and 80b-6(2)].

## RELIEF REQUESTED

The Commission respectfully requests that this Court:

    i.    enter an order permanently enjoining Defendant Garth Peterson from violating Sections 13(b)(5) and 30A of the Exchange Act [15 U.S.C. §§ 78m(b)(5) and 78dd-1] and Sections 206(1) and 206(2) of the Advisers Act [15 U.S.C. §§ 80b-6(1) and 80b-6(2)];

    ii.    order Defendant Garth Peterson to pay a civil penalty pursuant to Sections 21(d)(3) and 32(c) of the Exchange Act [15 U.S.C. §§ 78u(d)(3) and 78ff(c)] and Section 209(e) of the Advisers Act [15 U.S.C. § 80b-9(e)];

    iii.    order Peterson to disgorge ill-gotten gains wrongfully obtained as a result of his illegal conduct, including his interest in the Shanghai Jin Lin Tiandi Serviced Apartments, plus pre-judgment interest;

    iv.    freeze and appoint a receiver over Peterson's interest in the Shanghai Jin Lin Tiandi Serviced Apartments; and

v.    grant the Commission such other and further relief as is just and appropriate.

Dated: April 25, 2012

Respectfully submitted,

_____
Richard Hong

Of Counsel:
Gerald Hodgkins
Gregory Faragasso
David Neuman

Securities and Exchange Commission
100 F Street, N.E.
Washington, D.C.  20549
Tel: 202-551-4431 (Hong)
Facsimile:  (202) 772-9246